**Randall A. CASTELLANI and Joseph J. Corcoran, Appellees**

v.

**The SCRANTON TIMES, L.P., t/d/b/a The Scranton Times and The Tribune, and Jennifer Henn, Appellants.**

Superior Court of Pennsylvania.

Argued Aug. 30, 2006.

Filed Jan. 3, 2007.

Walter T. McGough, Jr., Pittsburgh, for Henn and Scranton, appellants.

Richard A. Sprague, Philadelphia, for Corcoran and Castellani, appellees.

BEFORE: LALLY–GREEN, TODD and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 The Scranton Times, L.P., t/d/b/a The Scranton Times and The Tribune (the Scranton Times) and Jennifer L. Henn (Henn) (collectively Appellants), appeal the order entered on June 3, 2005, as modified on July 15, 2005, in the Court of Common Pleas of Lackawanna County, that granted Appellee's "Motion to Compel Disclosure of the Identity of the Unnamed Source Referred to in Newspaper Articles Published on the January 12, 2004 Editions of THE SCRANTON TIMES and THE TRIBUNE." On appeal, Appellants assert that the trial court's granting of Appellees' motion to compel violated their rights under the Pennsylvania Shield Law (Shield Law), 42 Pa.C.S.A. § 5942, and the First Amendment Reporter's Privilege. Upon review, we reverse.

¶ 2 The relevant facts and procedural history of this case were set forth in part by the trial court in its opinion, filed June 3, 2005, as follows:

On or about January 7, 2004, [Appellees] filed a civil complaint against [Appellants]. In late 2003, the Office of the Attorney General of The Commonwealth of Pennsylvania "caused to be empanelled the twentieth statewide grand jury (the grand jury) to investigate allegations of wrongdoing at the Lackawanna County Prison." (See Para. 16 of [Appellees'] Complaint). On or about December 2, 2003, [Appellees], pursuant to duly served subpoenas, testified before the aforementioned grand jury. At all times relevant hereto, but more specifically, at the time of their appearance, [Appellees] were Lackawanna County Majority Democratic Commissioners and were also members of the Lackawanna County Prison Board. (See Paras. 17, 18 of [Appellees'] Complaint).

On January 12, 2004, [Appellants] published front page stories carrying the headlines "Dems Stonewall Grand Jury" (appearing in THE TRIBUNE) and "Dems Stonewall" (appearing in THE SCRANTON TIMES). (See Exhibit A of [Appellees'] Complaint). Except for the headlines, the stories are nearly identical and were authored by staff writer and [Appellant Henn] of THE TRIBUNE and THE SCRANTON TIMES, respectively. (See Exhibit A to [Appellees'] motion [FN1] ).

[FN1] Lackawanna County Court Judge Terrence R. Nealon, in his capacity as Supervising Judge of the Lackawanna County Investigating Grand Jury, is currently investigating alleged leaks of secret grand jury information to [Appellant Henn] in 2003 and 2004. *In re County Investigating Grand Jury VIII. 2003,* No. 03 Misc. 140, 2005 WL 4807444 Nealon, J. (Lacka.Co. Feb. 16, 2005), *aff'd,* No. 29 MM 2005 (Pa. April 15, 2005).

Making obvious reference to [Appellees], and as indicated above, the headlines of both articles claim that the "Dems" stonewalled the grand jury. In THE TRIBUNE, and as part of the headlines, there appears the following language:

## "DEMS STONEWALL GRAND JURY"

### Corcoran, Castellani evasiveness infuriates jurors, source claims

In THE SCRANTON TIMES article, and as part of the headlines, there appears to be the following language:

**"DEMS STONEWALL"**

**Source: Corcoran, Castellani Vague Before Grand Jury**

[Appellees] claim that both aforementioned articles "contain defamatory statements, innuendo and implications." In the body of the articles and, among the alleged published defamatory statements, were the following:

[Appellees] were less than candid, the Times Tribune has learned.

[Appellees] were "considerably less cooperative" with the jurors, often responding with vague, evasive answers, including "I don't recall" and "not that I'm aware of," a source close to the investigation said.

"[Appellees] testimony really irritated the jurors. [The jurors] were ready to throw both of them out," the source said.

"After months of hearing all kinds of detailed, specific information and testimony, [the jurors] just had no tolerance for that kind of crap."

"[The jurors] were ready to take out the big hook and yank each of them out of the witness chair."

A review of both articles attributed the aforementioned information to "an unnamed source close to the investigation."

The crux of [Appellees'] defamation case is their allegation that the subject news articles were false and defamatory. In support of their claims, [Appellees] direct[ed] the [trial court's] attention to the grand jury presentment attached as Exhibit B to their Motion. [Appellees] alleg[ed] that the presentment spoke of the testimony of [Appellees] having "corroborated" the grand jury investigation. Furthermore, the presentment "contained no grand jury criticism of the substance or manner of the testimony rendered by [Appellees] before the grand jury." (See Para. 6 of [Appellees'] Motion).

In addition to the above, and in further support of the defamatory nature of the subject articles, [Appellees] also direct[ed] the [trial court] to Judge Isaac Garb's September 14, 2004 Memorandum. Judge Isaac Garb was the Supervising Judge of the subject grand jury proceedings. Shortly after the publication of the subject articles, [Appellees] presented Judge Garb with a petition for sanctions. The petition was predicated on alleged disclosures of the grand jury proceedings to [The Scranton Times]. Judge Garb denied the petition for sanctions based on a lack of standing but appointed a special prosecutor to investigate the source of "unlawfully disclosed matters." (See [Judge] Garb's order dated April 13, 2004, attached to Exhibit E of [Appellees'] Motion). Upon conclusion of the investigation, the Special Prosecutor was directed to "submit a written report" to Judge Garb. (See Exhibit E of [Appellees'] Motion).

Upon review of the Special Prosecutor's report, Judge Garb, in his Memorandum of September 14, 2004, concurred with the Special Prosecutor that "there was no breach of secrecy by any agent of the Attorney General's Office." Furthermore, Judge Garb concluded:

[. . .]

The reports in these newspapers which purport to be a reflection of the testimony of [Appellees] are totally at variance with the transcript of their testimony before the Grand Jury. The characterization of their testimony in the newspaper reports is belied by the record. [Appellees] testified unhesitatingly and clearly. [Appellees] were cooperative. Their testimony was not

vague. At no time did the Grand Jurors become irate or indicate a readiness to throw the witnesses out of the Grand Jury room. . . .

. . . We have reviewed [the Special Prosecutor's report], and all of the documents filed with it, including the testimony of [Appellees], as well as the newspaper reports, and concur in the [Special Prosecutor's] conclusion. The reports published in these newspapers are completely at variance with the transcript of the testimony of the witnesses. The newspaper reports provide that the witnesses were evasive in their answers, were noncooperative, essentially "stonewalled" the Grand Jury in its inquiry and that the Grand Jurors became irate as a result of that demeanor on [Appellees'] part, and demanded that they be "thrown out" of the Grand Jury courtroom. None of those things happened. Obviously, if someone wished to leak the testimony of a witness to the Grand Jury, that information relayed to the media would have reflected the testimony that actually occurred. The report of the testimony of [Appellees] was totally at variance and not borne out by the record of [Appellees'] testimony. Obviously, the source of [Appellant Henn's] information was someone not privy to the Grand Jury proceedings and, therefore, not someone in the Office of the Attorney General

/S/ ISAAC S. GARB, SENIOR JUDGE

(See Exhibit F to [Appellees'] Motion).

[Appellees] argue[d] that, based upon the above backdrop, it cannot be disputed "that the information attributed to the unnamed source in THE SCRANTON TIMES and THE TRIBUNE January 12, 2004 newspaper articles were lies, were false, and were inaccurate." (See Para. 15 of [Appellees'] Motion). Furthermore, and referencing [The Scranton Times'] "posted policies and procedures," [The Scranton Times has] adopted a policy to waive any confidentiality if "a source lies to the newspaper." (See Exhibit G of [Appellees'] Motion).

[Appellees] claim[ed] that the source upon whom [Appellants] have relied "engaged in tortious, criminal, or contemptuous conduct." [Appellees] further claim that the "sole and exclusive possession" of the identity of the source lies with [Appellants]. [Appellees] also assert[ed] that they have exhausted all efforts to obtain the identity of the source by other means. [Appellees] have demanded of [The Scranton Times] to disclose the source, which they have correspondingly refused. [Appellees] have also requested of Judge Barry Feudale, (new supervising judge of the statewide grand jury) among other documents, release of the Special Prosecutor's report. To the best of [the trial court's] knowledge, that request is still pending.

In response to the requested disclosure, [Appellants] have asserted their privilege pursuant to the Pennsylvania Shield Law, 42 Pa.C.S.A. § 5942(a), and the First Amendment Reporter's Privilege.

*Castellani v. Scranton Times, L.P.*, 73 Pa. D. & C.4th 483, 484–90 (C.P.Lack.2005).

¶ 3 After filing their motion to compel, Appellees served interrogatories on Appellants that questioned Appellants regarding the identity of the source for the January 12, 2004 articles, but Appellants asserted their rights under both the Shield Law and the First Amendment Reporter's Privilege. Thereafter, the trial court conducted a hearing on Appellees' motion to compel and received briefs from the parties.

¶ 4 On June 3, 2005, the trial court granted Appellees' motion to compel and ordered Appellants to reveal the identity of its source for the January 12, 2004 articles. The trial court authored an opinion in support of its order. In its opinion, the trial court concluded that the privileges afforded to reporters under the Shield Law and the First Amendment could not be asserted to the detriment of the grand jury system and to the detriment of an individual's constitutional right to reputation. *Castellani*, 73 Pa. D. & C.4th at 524.

¶ 5 On July 1, 2005, Appellants filed a notice of appeal to this Court pursuant to Pa.R.A.P. 313 (relating to appeals of interlocutory orders as of right). Thereafter, pursuant to Appellants' motion, the trial court amended its order on July 15, 2005, to include a statement that its order involved controlling questions of law as to which there was a substantial ground for difference of opinion, and that an immediate appeal would advance materially the ultimate resolution of the matter. The trial court did not order Appellants to file a concise statement of matters complained of on appeal, and it did not author a second opinion in this case.

■ ¶ 6 During the pendency of Appellants' appeal, Appellants filed with this Court a petition for permission to appeal pursuant to Pa.R.A.P. 312 and Pa.R.A.P. 1311. We denied this petition as moot because it is clear that Appellants' appeal is, in reality, from an interlocutory discovery order appealable through the "collateral order doctrine." The "collateral order doctrine" permits immediate appeal of an otherwise non-appealable interlocutory order where the following elements are met: (1) the order is separable from and collateral to the main cause of action; (2) the

right involved is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. *See* Pa. R.A.P. 313(a), (b). The "collateral order doctrine" is construed narrowly, and each prong of the aforementioned test must be met before an order may be considered appealable under the doctrine. *See Harrison v. Hayes*, 870 A.2d 326, 327 (Pa.Super.2005).[1]

■ ¶ 7 Prior to the decision of the Pennsylvania Supreme Court in *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547 (1999), Pennsylvania courts did not often entertain interlocutory appeals from discovery orders, unless the discovery order was not related in any way to the merits of the action itself. *See, e.g., Doe v. Commonwealth, Dept. of Public Welfare*, 105 Pa. Cmwlth. 482, 524 A.2d 1063, 1065 (1987); *see also Gottschall v. Jones & Laughlin Steel Corp.*, 333 Pa.Super. 493, 482 A.2d 979 (1984) (semble). In *Schwartz*, the Pennsylvania Supreme Court relaxed this rule and held that an appeal from a discovery order raising a question of the application of a privilege is separable from the underlying issue, so long as the issue of privilege may be addressed by an appellate court without analysis of the underlying issue. *Schwartz*, at 483, 729 A.2d at 551–52.

¶ 8 In the present case, we may address Appellants' appeal without analysis of the underlying issue. The issues that Appellants present may be addressed by this Court without reference to the underlying defamation case because the issues do not bear any relationship to the elements that must be proven by Appellees in their defamation case. We must consider next

1. We note that the trial court's July 15, 2005 order does not conform to any of the *criteria* set forth at Pa.R.A.P. 311 (regarding interlocutory appeals as of right).

whether the right asserted by Appellants is too important to be denied review. Clearly, the privilege provided by 42 Pa. C.S.A. § 5942 and the related First Amendment Reporter's Privilege are deeply rooted in the public policy of this Commonwealth and the public policy of the United States. It cannot be gainsaid that these privileges exist to promote the free flow and exchange of ideas and information to the news media and that such intercourse is essential to the existence of a democratic republic. *See, e.g., Hatchard v. Westinghouse Broadcasting Company*, 516 Pa. 184, 192, 532 A.2d 346, 350 (1987) (obvious purpose of Shield Law is to permit free flow of information to news media). Accordingly, we are satisfied that Appellants met the second prong of the "collateral order doctrine." *See Hayes*, 870 A.2d at 327. Likewise, we are satisfied that Appellants meet the third prong of the collateral order doctrine; in *Schwartz*, our Supreme Court held that no effective means exist of reviewing an order that requires the production of putatively protected material after a final judgment has been entered in the case. *Schwartz*, at 485, 729 A.2d at 552. As such, we are satisfied that the trial court's July 15, 2005 order is an appealable collateral order. *See Hayes*, 870 A.2d at 327. Accordingly, we will turn to a review of the merits of Appellants' issues.

¶ 9 Appellants argue first that the trial court erred by creating an exception to the Shield Law. As this argument presents a pure question of law, our scope of review is plenary, *see In Re Hasay*, 546 Pa. 481, 686 A.2d 809 (1996), and our standard of review is *de novo*. *See Otte v. Covington Twp. Road Supervisors*, 539 Pa. 44, 650 A.2d 412 (1994).

¶ 10 The Shield Law, codified at 42 Pa. C.S.A. § 5942, states the following: Confidential communications to news reporters

(a) GENERAL RULE.—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

(b) EXCEPTION.—The provisions of subsection (a) insofar as they relate to radio or television stations shall not apply unless the radio or television station maintains and keeps open for inspection, for a period of at least one year from the date of the actual broadcast or telecast, an exact recording, transcription, kinescopic film or certified written transcript of the actual broadcast or telecast.

¶ 11 The privilege created by the Shield Law, as recognized by the trial court, has few exceptions. *See, e.g., Castellani*, 73 Pa. D. & C. 4th at 503. The first exception is written directly into the statute itself, and has no application to the present case. *See* 42 Pa.C.S.A. § 5942(b). The second was recognized by the Pennsylvania Supreme Court in *Hatchard*, wherein the Court held that a news agency[2] would not be protected by the Shield Law where an individual suing that news agency for defamation seeks to obtain through the discovery process unpublished documentary information gathered by that news agency, *to the extent that the documentary information does not reveal the identity of*

---

**2.** In *Hatchard*, the news agency in question was a television station.

a personal source of information or that the documentary information may be redacted to eliminate the revelation of a personal source of information. *Hatchard*, at 195, 532 A.2d at 351 (emphasis added); *see also Davis v. Glanton*, 705 A.2d 879 (Pa.Super.1997) (semble). *Hatchard* was founded on the following concerns of our Supreme Court: (1) that its previous broad interpretation of the then-existing Shield Law in *In re Taylor*, 412 Pa. 32, 193 A.2d 181 (1963), *overruled in part by Hatchard*, at 195, 532 A.2d at 351, could run afoul of the United States Supreme Court's "constitutionalization" of defamation law in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny; and (2) that a right to reputation was inherent and indefeasible in this Commonwealth, and, as such, an individual must have access to information that would permit him to obtain adequate redress in the courts for a news agency's harm to his reputation. *Hatchard*, at 192–94, 532 A.2d at 351. Therefore, *Hatchard* serves to strike a balance between a news agency's privilege under the Shield Law with an individual's right to obtain information for the purpose of seeking redress in the courts for damage to his reputation by a news agency. *See id.*, at 192–94, 532 A.2d at 351.

 ¶ 12 Thus, it is plain from the holding of *Hatchard* that the Pennsylvania Supreme Court did not extend its exception to the Shield Law to the *identity of the confidential source*. *Hatchard*, at 195, 532 A.2d at 351. It is obvious that if the Court extended its exception to include the identity of the confidential source, it would have rewritten the Shield Law entirely, and no court in this Commonwealth may undertake such an action. *See Wogelmuth v. Harleysville Mut. Ins. Co.*, 370 Pa.Super. 51, 535 A.2d 1145, 1151 (1988) (a court may not rewrite a statute under the pre-

text of interpretation or pursuing its spirit; courts are bound to give effect to intention of General Assembly); *see also* 1 Pa.C.S.A. § 1921. Therefore, the trial court's crafting of a "crime-fraud" exception to the Shield Law which requires the revelation of the identity of the confidential source of the news agency's information runs afoul of *Hatchard*. *Hatchard*, at 195, 532 A.2d at 351. *Accord Sprague v. Walter*, 518 Pa. 425, 436, 543 A.2d 1078, 1083 (1988) (Wherein our Supreme Court forbade the extension of the Shield Law to allow the inference at trial that the assertion of the Shield Law privilege by a news agency in a media defamation case also constitutes an attestation by the news agency of the truthfulness of the confidential source. The Court also held that the plaintiff may introduce rebuttal evidence in a media defamation case indicating that the record does not disclose any evidence to support the reliability of the information received from the confidential source or attesting to the credibility of the source that supplied that information.); *contrast Commonwealth v. Bowden*, 576 Pa. 151, 171, 838 A.2d 740, 752 (2003) (Wherein our Supreme Court held that documents may be considered "sources" for purposes of the application of the Shield Law, but only where the documents, even if redacted, could breach the confidentiality of the confidential source; however, where the original source does not request confidentiality and his statements do not name secondary confidential sources, the Shield Law does not prohibit the compelled disclosure of the original source's statements.).

¶ 13 The fact that a crime may have occurred by virtue of the alleged disclosure of certain grand jury testimony does not necessitate or empower this Court to craft a new exception to the Shield Law; the Pennsylvania Supreme Court was presented with a nearly identical question in *Taylor*, and it concluded that the public in-

terest "[would] be benefited more extensively and to a far greater degree by protection of all sources of disclosure of crime, conspiracy and corruption than it would be by the occasional disclosure of the sources of newspaper information concerning a crime[.]" *Taylor,* at 41, 193 A.2d at 185, *overruled in part on other grounds by Hatchard,* at 195, 532 A.2d at 351. Even when viewed in light of *Hatchard,* the aforementioned conclusion of our Supreme Court remains the law of this Commonwealth, and neither the trial court nor this Court may overrule it. *Hatchard,* at 195, 532 A.2d at 351 (regarding continuing viability of *Taylor); see also M.A. v. Brabender,* 839 A.2d 1133, 1135–36 (Pa.Super.2003) (Despite the existence of an appealing result to the contrary, the inferior courts of this Commonwealth are duty bound to apply precedent of the Pennsylvania Supreme Court until such precedent is overruled by that Court.). Accordingly, we are constrained to conclude that the trial court's finding of an exception to the Shield Law on the basis of enforcing and protecting the security and secrecy of the grand jury process exceeded the boundaries of the exception set forth by the Pennsylvania Supreme Court in *Hatchard. Wogelmuth,* 535 A.2d at 1151.

¶ 14 While we are both mindful of and sympathetic to the concerns of the learned trial court regarding possible criminal violations of the grand jury process *vis-à-vis* the Shield Law privilege, we, like the trial court, are forbidden from reading into the Shield Law an exception neither enacted by the General Assembly nor found by the Supreme Court as the result of a developing body of law. *Wogelmuth,* 535 A.2d at

1151; *see also* 1 Pa.C.S.A. § 1921. As such, we conclude that Appellants, a news agency and an employee of a news agency, should not have been compelled to divulge the source of information for the January 12, 2004 articles. Therefore, we must reverse the trial court's order of July 15, 2005.[3]

¶ 15 Order reversed. Jurisdiction relinquished.

¶ 16 TODD, J. files a Concurring Opinion.

CONCURRING OPINION BY TODD, J.:

¶ 1 I concur in the result reached by the Majority as I agree, in this civil case, that we are bound by our Supreme Court's precedent interpreting the Shield Law, and therefore that the order of the trial court requiring Appellants to divulge their source for the January 12, 2004 articles must be reversed. *See In re Taylor,* 412 Pa. 32, 193 A.2d 181 (1963); *Hatchard v. Westinghouse Broadcasting Company,* 516 Pa. 184, 532 A.2d 346 (1987); *Commonwealth v. Bowden,* 576 Pa. 151, 838 A.2d 740 (2003). However, for the reasons discussed below, I would leave open the possibility that there may be circumstances under which the Shield Law might have to yield.

¶ 2 The trial judge, the Honorable Robert A. Mazzoni, has, in a very thoughtful and scholarly fashion, analyzed the competing interests asserted in this case: preservation of grand jury secrecy versus the public policy behind the Shield Law. The trial court, "intend[ing] to afford pri-

---

**3.** Inasmuch as we conclude that the trial court violated Appellants' privilege under the Shield Law, we need not reach Appellants' constitutional argument regarding the First Amendment Reporter's Privilege. *See Ballou v. State Ethics Commission,* 496 Pa. 127, 129,

436 A.2d 186, 187 (1981) (When a case raises both constitutional and nonconstitutional issues, a court should not reach the constitutional issue if the case can properly be decided on nonconstitutional grounds.).

ority to the disclosure of a source where the suggested criminal activity involves the intended confidential operation of the grand jury system" (Trial Court Opinion, 6/3/05, at 30), concluded that the Shield Law should be pierced under the circumstances of this case. I find, however, that this conclusion cannot be sustained in view of *Taylor, supra,* wherein our Supreme Court held that the predecessor statute to the Shield Law[4]

> must therefore, we repeat, be liberally and broadly construed in order to carry out the clear objective and intent of the Legislature *which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare* than the disclosure of the alleged crime or the alleged criminal.

*In re Taylor,* 193 A.2d at 185–86 (emphasis original and footnote omitted).[5]

¶ 3 Arguably, the facts presented in the instant case are different from those contemplated in *Taylor* in that, instead of simply providing supplementary evidence about a crime, the journalists herein may be an integral part of, and perhaps the sole witnesses to, a crime. Nevertheless, *this is a defamation action,* and Appellees seek the identity of Appellants' confidential source *in that context.* Critically, Appellees are *not* seeking this disclosure because it may evidence a breach of grand jury secrecy; that is, whether such a crime has occurred is of no moment to Appellees' defamation action—it is coincidental. (In-

deed, for this same reason, this litigation is a poor forum for assessing the competing interests raised, as Appellees' interest in the integrity of the grand jury proceedings is tangential at best.)

¶ 4 Further, despite the trial court's eloquent and proper concern for the sanctity of the grand jury process and its equally proper concern that "[a]llowing the grand jury proceedings to be published without appropriate consequences and/or remedies serves only to pervert the grand jury process" (Trial Court Opinion, 6/3/05, at 28–30), the disclosure ordered in this lawsuit will not provide any such consequence or remedy. The public interest in grand jury secrecy will be vindicated only indirectly.

¶ 5 However, I would not foreclose the possibility, as does the Majority, that in a future case—for example where, in a criminal prosecution of a grand jury leak, a reporter's evidence about the source of that leak is sought—the Shield Law may have to yield. In such a prosecution, we might have sufficient assurance that a disclosure otherwise protected by the Shield Law was sought precisely *because* of its relevance to the investigation and punishment of a grand jury leak. Indeed, I believe only in such a case, where the interest of the state and the public in the disclosure is at its zenith, can we consider creating an exception to what is, on its face, an unambiguous Shield Law.

**4.** The predecessor statute contained, in relevant part, substantially similar language to the Shield Law.

**5.** While not disturbing those conclusions of *Taylor* relevant herein, our Supreme Court has subsequently narrowed its holding in *Taylor,* finding that it should be construed as applying only to confidential sources or documentary materials identifying sources. *See*

*Hatchard,* 532 A.2d at 351 ("We therefore conclude that, to the extent that language in *In re Taylor* may be read as interpreting the Shield Law to protect from discovery, in defamation actions, documentary material that could not reasonably lead to the discovery of the identity of a confidential media-informant, that decision interpreted the Shield Law much too broadly.")